# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TIMOTHY J. F. PIRO, II, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 12-CV-647-PJC |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration,[1] | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, Timothy J. F. Piro, II ("Piro"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance benefits and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Piro appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Piro was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Piro was 29 years old at the time of the hearing before the ALJ on January 11, 2012. (R. 32, 39). Piro testified that he had graduated from high school and he had attended some college classes. (R. 40). He had last worked during the holiday season of 2010. (R. 42-43).

Piro testified that his physician had explained that the numbness and tingling he felt in his feet were symptoms of diabetic neuropathy caused by his high blood sugar levels and his failure to take care of his diabetes. (R. 49-50). He had not always been able to afford his medications. *Id.* In his right leg, the numbness and tingling symptoms went up to his knee, but in his left leg, they went up to his hip. *Id.* Piro testified that he could hardly feel his feet at all and he couldn't tell where he was stepping when he walked. (R. 50). In his knees, the neuropathy caused a pain like arthritis and, if he stood for a long time, that caused "really strong pins and needle sensations." *Id.* His left hip had "unbearable" pain any time he moved it. *Id.* Piro testified that his pain would be "just unbearable" if he stood for ten minutes. (R. 48). Any type of movement caused the pain. *Id.*

The longer he sat at one time, the more problems Piro would have with neuropathy. *Id.* To alleviate his problems, he would try propping up his feet, and then he would get up and move around. (R. 50-51). He estimated that he spent about half of his waking day with his feet propped up. (R. 51).

When his blood sugar levels were high, Piro would become tired and irritable, and he would take an extra dose of insulin. *Id.* When his blood sugar levels were low, he would get shaky and his vision would blur a bit. *Id.* He would try to eat something to bring the level back up. *Id.* He tested his levels three times a day, and they could range from 2 to 300. (R. 51-52).

2

His physicians had told him that he was getting kidney damage as a result of his diabetes, and he was prescribed medication to help with that. (R. 52). It took him longer to void completely due to this kidney problem. *Id.*

Piro estimated that he drove about twice a week. *Id.* On a typical day, he got up about 8:00 a.m. and went to bed at 11:00 p.m. (R. 43). Out of the nine hours between 11:00 p.m. and 8:00 a.m., he estimated that he got about six hours of sleep. (R. 46). He had trouble staying asleep because of pain, which he described as shooting up his leg. (R. 46-47). He took a two- to three- hour nap during the day. (R. 47). He could do all personal care tasks except that he had problems putting on socks due to pain. (R. 43-44). Piro did his own laundry and cooking, and he did the outdoor tasks such as mowing and raking. (R. 44). Piro read for pleasure for an hour or so, and he also played video games. (R. 44-45). After reading a book or watching television for about 20 minutes, Piro's eyesight would get blurry. (R. 53). He visited with friends about once a week. (R. 45).

Piro had trouble with fatigue, and he was short of breath when he did any physical activity. (R. 47). He had to stop to rest. *Id.* He said that if he stayed out in heat longer than about 45 minutes, he would "end up with heat exhaustion." (R. 47-48).

Piro testified that he had been diagnosed with "minor depression." *Id.* He could not remember details of who made this diagnosis and when, but Piro remembered he had been on prescription medication for depression in the past. (R. 45-46).

Piro testified that he had attempted about 32 jobs since 1997, but he had not been successful due to excessive absences caused by his diabetes. (R. 48). The pain was unbearable, and his blood sugar levels would become excessively high or low. (R. 48-49). He had also missed work due to hospitalizations. *Id.*

Piro was seen by Michele Coulter, D.O. at Warren Clinic on October 24, 2007 for follow up of diabetes. (R. 301-02). Notes indicate that Piro was having trouble getting his blood sugar level controlled with regular insulin, and his levels were ranging from 170 to 200 on his current dose. (R. 301). He had no foot sores or pain, and he had no vision changes. *Id.*

Piro was seen by Patrick L. Murphy, M.D. at Warren Clinic on October 16, 2008, and a foot examination showed callus buildup on both feet, but no loss of sensation. (R. 291-96). All other results of physical examination were normal. *Id.* Dr. Murphy assessed diabetes mellitus type I in poor control with poor compliance. (R. 291, 296).

Piro returned to the Warren Clinic on January 16, 2009, and Dr. Murphy again noted poor compliance, and he noted Piro's complaints of depression symptoms with suicidal ideation. (R. 281-86). Foot examination still showed no loss of protective sensation. (R. 283). Dr. Murphy prescribed Lexapro in addition to diabetes medications. (R. 286). On February 2, 2009, Piro complained of a lesion on his left heel and a chest rash, and he was assessed with cellulitis of his heel. (R. 277-80). His heel was better on February 9, 2009, but still had drainage. (R. 273-76). Piro saw Dr. Murphy again on May 7, 2009 for knee pain with swelling and redness that he had experienced for one week. (R. 267-69). Dr. Murphy assessed cellulitis and abscess of Piro's leg and prescribed antibiotics. (R. 268-69).

Piro saw Renee Frenier, D.O. at Warren Clinic on July 20, 2009 for follow up of his diabetes. (R. 262-64). On examination, multiple sores and lesions were noted. (R. 263). Assessments included diabetes with renal manifestation, type I, not stated as uncontrolled; and hypercholesterolemia, pure. *Id.* On September 16, 2009, Piro complained of left ankle pain and some foot lesions with difficulty healing. (R. 254-56). Dr. Frenier assessed an achilles tendon injury and said that Piro's diabetes would likely delay healing. (R. 255-56). On December 7,

2009, Piro presented with pain in both legs. (R. 249-51). On examination, Piro's knees and ankles had no heat or swelling, and he had full range of motion of these joints. (R. 250). Assessments included diabetes, type I uncontrolled; diabetes with renal manifestation type I not stated as uncontrolled; hypercholesterolemia pure; and other specific idiopathic peripheral neuropathy. *Id.* There was a note that Piro could not afford Neurontin or Lyrica, so Lortab was prescribed at a dose of one each night. *Id.*

Piro saw Dr. Frenier on July 20, 2010 with pain in both legs. (R. 334-36). Piro said that his feet were numb and occasionally his calves ached and hurt. (R. 334). He said the leg pain had been ongoing for six months, and walking, standing, or sitting with his legs dangling made it worse. *Id.* He also complained of occasional pain of his low back, upper back, and neck. *Id.* On examination, Piro had normal strength and range of motion of all extremities. (R. 335). The first assessment was diabetes mellitus, juvenile, uncontrolled. *Id.* The second assessment was other specific idiopathic peripheral neuropathy. *Id.* Piro returned on October 20, 2010, and on examination he had numbness of his feet, with no lesions. (R. 343-45).

Piro saw Anu R. Prabhala, M.D. at Warren Clinic on April 12, 2011 for counseling and education on strategies to get sugar levels down and to count carbohydrates. (R. 377-80). Piro returned to see Dr. Frenier on October 19, 2011 with vision changes in his left eye, sugar levels above 200 during the day, and low sugar levels at bedtime. (R. 386-88). Dr. Frenier adjusted his medications. *Id.*

Agency consultant Seth Nodine, M.D. completed a physical examination and report of Piro on October 13, 2009. (R. 238-46). Dr. Nodine's examination was essentially normal, although Piro commented that his sensation when his feet were touched was "different" and "tingling." *Id.* Dr. Nodine's assessments were insulin dependent diabetes with non-compliance with peripheral neuropathy; and dyslipidemia. (R. 240).

On February 18, 2011, agency nonexamining consultant Luther Woodcock M.D. completed a review of the evidence of Piro's physical impairments. (R. 355). He noted Piro's activities of daily living, the treating evidence, and Dr. Nodine's report. *Id.* He concluded that Piro's physical impairments were nonsevere. *Id.*

Agency nonexamining consultant Deborah Hartley, Ph.D. completed a Psychiatric Review Technique Form on August 30, 2010, finding that Piro's mental impairments were nonsevere. (R. 318-331). Dr. Hartley noted for Listing 12.04 that Piro had depression. (R. 321). For the "Paragraph B Criteria,"[2] Dr. Hartley found that Piro had a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 328). In the "Consultant's Notes" portion of the form, Dr. Hartley said that a treating note on December 2009 indicated a diagnosis of depression. (R. 330). While Piro had reported Cymbalta as a medication for neuropathy, Dr. Hartley could not find a reference to Cymbalta in

---

[2] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

6

treating notes. *Id.* Dr. Hartley summarized Piro's activities of daily living, and she concluded that he had no diagnosis or treatment for a mental impairment and his activities of daily living were not limited due to any mental impairment. *Id.*

A second, undated, and unsigned Psychiatric Review Technique Form is included in the administrative transcript. (R. 356-69). The form is essentially identical to the form completed by Dr. Hartley, except in the Consultant's Notes portion of the form, it was noted that Piro was diagnosed with depression on October 20, 2010 and was taking Amitriptyline. (R. 368). The form states that no new or additional limitations were reported. *Id.*

Dr. Frenier wrote a "To Whom It May Concern" letter dated October 25, 2010. (R. 370). Dr. Frenier wrote that Piro was a "complicated patient" whose medical problems included diabetes mellitis type I, hyperlipidemia, peripheral neuropathy, diabetic nephropathy, gastroparesis, and stress. *Id.* She wrote that Piro experienced very high levels of blood sugar, with some lows resulting from aggressive treatment, and he was unable to maintain the levels in an ideal range due to his "brittle" diabetes. *Id.* She said that Piro's neuropathy was her primary concern, and she noted that Piro had pain and numbness in his feet that had not improved with treatment. *Id.* Dr. Frenier wrote that Piro had difficulty working due to the pain and numbness in his feet. *Id.* She said that the condition was dangerous due to the inability to feel his feet when walking and due to the risk of injury and infection. *Id.*

## Procedural History

Piro filed applications in July 2010 for Title II disability insurance benefits and for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (R. 132-54). Piro asserted that he became disabled on June 16, 2009. (R. 132). The applications were denied initially and on reconsideration. (R. 70-78, 82-87). A hearing before

ALJ David W. Engel was conducted on January 11, 2012. (R. 32-62). By decision dated February 24, 2012, the ALJ found that Piro was not disabled. (R. 13-26). On October 5, 2012, the Appeals Council denied review of the ALJ's findings. (R. 27-31). Thus, the decision of the ALJ represents a final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[3]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[3] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Piro met insured status requirements through June 30, 2014. (R. 16). At Step One, the ALJ found that Piro had not engaged in substantial gainful activity since his alleged onset date of June 16, 2009. *Id.* At Step Two, the ALJ found that Piro had severe impairments of diabetes, depression, neuropathy, back pain, and allied disorders. *Id.* At Step Three, the ALJ found that Piro's impairments did not meet or medically equal the severity of a Listing. (R. 17).

The ALJ determined that Piro had the RFC to perform a range of work in the sedentary exertional level. (R. 18). He gave detailed limitations in reaching overhead, in using foot pedals, in postural activities, and in avoiding environmental hazards. *Id.* At Step Four, the ALJ found

that Piro could not perform any of his past relevant work. (R. 24). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Piro could perform, considering his age, education, work experience, and RFC. *Id.* Thus, the ALJ found that Piro was not disabled from June 16, 2009 through the date of the decision. (R. 26).

## Review

Piro argues that the ALJ erred in his consideration of Dr. Frenier's opinion evidence, that the ALJ erred by failing to include any limitations in his RFC determination that addressed Piro's depression, and that the ALJ's credibility assessment was not adequate. Regarding the issues raised by Piro, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Therefore, the ALJ's decision is affirmed.

**Dr. Frenier's Letter**

A treating physician's opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215; *see also* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). However, even if the ALJ determines that the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and must be weighed according to the factors set out in Sections 404.1527(d) and 416.927(d). Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quotation omitted). While an ALJ need not discuss every factor, he must at least provide "good reasons in [the] decision for the weight" given to the opinions of a treating physician. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

Before discussing how the ALJ addressed the letter by Dr. Frenier, the Court first notes that not all of her letter constituted an "opinion" by a treating physician. The Tenth Circuit in *Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008) explained that a "true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." Thus, the court found that a statement by a treating physician that the claimant had a stroke "and I feel he may never return to work" was not a true medical opinion. *Id. See also Martinez v. Astrue,* 316 Fed. Appx. 819, 822-23 (10th Cir. 2009) (unpublished) (ALJ did not need to provide specific legitimate reasons for rejecting portion of treating physician's letter that contained only generalized statements); *Mann v. Astrue*, 284 Fed. Appx. 567, 570 (10th Cir. 2008) (unpublished) (treating physician recommendation that the claimant see an orthopedic specialist was not a treating physician opinion because it did not address functional limitations).

Here, Dr. Frenier gave an opinion that Piro had "difficulty working due to the numbness and pain in his feet." (R. 370). More specifically she explained that Piro's neuropathy limited his ability to walk. *Id.* The Court notes that the ALJ's RFC appears to address Dr. Frenier's concerns by limiting him to a range of sedentary work. (R. 18). The ALJ limited Piro to only occasional use of foot pedals, and he included environmental limitations by stating that Piro could not be exposed to unprotected heights or dangerous moving machinery parts and he could not climb ropes, ladders, or scaffolds. *Id.* The ALJ included limitations to only occasional

11

climbing, bending, stooping, crouching, and crawling. *Id.* All of these appear to address Dr. Frenier's concerns and her opinion that Piro would have difficulty walking. *See Taylor v. Astrue*, 266 Fed. Appx. 771, 776-77 (10th Cir. 2008) (unpublished) (affirming when ALJ incorporated many restrictions found by treating physician and gave reasons for discounting treating opinion).

When he explicitly addressed Dr. Frenier's letter, the ALJ said that he gave some weight, but not controlling weight, to Dr. Frenier's opinion. (R. 23). First, he said that it appeared that Dr. Frenier relied on Piro's subjective reports of his symptoms and limitations and accepted them uncritically. *Id.* The undersigned has disapproved of this reason generally as unsupported boilerplate. *See Gray v. Colvin*, 2013 WL 3717728 *7-8 (N.D. Okla); *Schieffer v. Astrue*, 2012 WL 1582032 *6-7 (N.D. Okla.). In Piro's case, however, Dr. Frenier's letter is an opinion about pain and numbness - symptoms that can only be reported by a patient as subjective complaints. Thus, this reason, when applied to Piro's situation, is not mere boilerplate, but is a legitimate reason for discounting Dr. Frenier's opinions.

A second reason given by the ALJ was that the course of treatment was not what would be expected if Piro were truly disabled. (R. 23). While the undersigned criticized this provision also in *Gray* and *Schieffer*, the Tenth Circuit has accepted it as legitimate reason for discounting treating physician opinions in some situations. *See DeFalco-Miller v. Colvin*, 520 Fed. Appx. 741, 746-47 (10th Cir. 2013) (unpublished); *Mayberry v. Astrue*, 461 Fed. Appx. 7705, 708-09 (10th Cir. 2012) (unpublished) (construing this provision as relying on inconsistencies between opinion and treating records). Here, while the Court joins the *Mayberry* court in considering this to be bordering on improper boilerplate, Piro's treating records reflect a course of treatment designed to adjust medications so that Piro can obtain control of his blood sugar levels. The treating records also reflect attempts by several medical professionals to educate Piro about the

importance of diet and regular testing of his blood sugar levels. Nothing in this course of treatment indicates that Piro cannot perform sedentary work with the numerous additional limitations found by the ALJ in his RFC determination.

Finally, the ALJ said that "testing" did not reveal numbness and tingling to the extent reported by Piro and did not reflect total disability. (R. 23). It would have been preferable for the ALJ to explain what "testing" he referred to and, indeed, to explain all of his reasons for the weight he attributed to Dr. Frenier's opinion with more clarity and specificity. Nevertheless, the undersigned finds that the ALJ's analysis was adequate, given the totality of his decision. As the Tenth Circuit explained in affirming a portion of an ALJ's decision that addressed opinion evidence:

> Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal. In conducting our review, we should, indeed must, exercise common sense. The more comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical perfection.

*Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). *See also Lauxman v. Astrue*, 321 Fed. Appx. 766, 769 (10th Cir. 2009) (unpublished) (while "it would have been helpful if the ALJ had elaborated" on his analysis of opinion evidence, the ALJ's decision was adequate).

Additionally, the ALJ's analysis here was adequate because his RFC determination was largely consistent with Dr. Frenier's letter. When evidence does not conflict with the ALJ's RFC determination, the ALJ has a reduced burden for "express analysis." *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004). In *Howard*, the Tenth Circuit rejected the claimant's argument that the ALJ had not complied with his obligation to discuss the evidence. The court first found that the ALJ's discussion was adequate, but then, as a second point, found that "perhaps more

13

importantly, in this case none of the record medical evidence conflicts with the ALJ's conclusion that claimant can perform light work. When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened." *Id.* *Howard* is applicable here because Dr. Frenier's letter was not inconsistent with the ALJ's RFC determination.

The ALJ said he gave "great weight" to the opinions of the examining and nonexamining consultants. (R. 23-24). The opinions of those consultants were substantial evidence that the ALJ was entitled to rely upon. *See Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination); *Leach v. Astrue*, 470 Fed. Appx. 701, 704 (10th Cir. 2012) (unpublished) (ALJ's RFC determination was supported by substantial evidence when it was based in part on reports of both examining and nonexamining consultants).

The ALJ did not err in his analysis of Dr. Frenier's letter, and his RFC determination was supported by substantial evidence.

**Mental Limitations**

Piro asserts that the ALJ erred by failing to include any mental limitations in his RFC after determining at Step Two that his depression was a "severe" impairment. The undersigned agrees that it would have been preferable if the ALJ had expressly explained why he decided not to include any mental limitations in his RFC determination. However, this is not a case in which depression was included as a severe impairment at Step Two and then ignored. The ALJ gave detailed analysis at Step Three, finding that all of Piro's limitations for the Paragraph B criteria were mild. (R. 17-18). Later in his decision, the ALJ gave a comprehensive summary of Piro's

14

testimony, including his reports of depression and problems with concentration. (R. 19). The ALJ also discussed the report of nonexamining consultant Dr. Hartley, finding that Piro's mental impairments were nonsevere. (R. 21).

The ALJ's decision shows careful consideration of all of the evidence regarding Piro's asserted mental impairments. There is certainly substantial evidence to support the absence of any mental limitations in Piro's RFC. Under these circumstances, the failure of the ALJ to provide further explanation for his decision to omit mental limitations is at most harmless error. *See Alvey v. Colvin*, 2013 WL 4529410 *3 (10th Cir.) (unpublished) (harmless error when ALJ failed to explain why his RFC included no mental limitations from nonsevere mental impairments given that evidence did "not support assessing any functional limitations from mental impairments"); *Keyes-Zachary*, 695 F.3d at 1173 (ALJ's failure to mention alleged side effect was harmless error given circumstances of case).

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary*, 695 F.3d at 1167.

At the onset, the Court notes that the ALJ's credibility assessment included many boilerplate provisions. Boilerplate language is disfavored because it fails to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered." *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). However, boilerplate language is "problematic only when it appears 'in the absence of a more thorough analysis.'" *Keyes–Zachary,* 695 F.3d at 1170 (quoting *Hardman*). Here, the Court ignores the boilerplate language that the ALJ used and reviews the "more thorough analysis" that the ALJ provided.

In addressing Piro's credibility, the ALJ first recounted Piro's activities of daily living and said that they were not as restricted as would be expected in someone whose limitations were disabling. (R. 22). Additionally, the ALJ noted that Piro told Dr. Nodine that he could walk for 45 minutes at a time, but in a function report stated that he could walk for 5-10 minutes. *Id.* Inconsistencies in a claimant's statements are a specific reason that supports a finding of reduced credibility. *Harris v. Astrue*, 496 Fed. Appx. 816, 821 (10th Cir. 2012) (unpublished), *citing* SSR 96-7p, 1996 WL 374186 at *5.

The ALJ noted that Piro was not "entirely compliant in taking prescribed medications." (R. 23). A claimant's lack of compliance with treatment is a legitimate factor in finding that the claimant's claim of disabling pain is not credible. *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000); *see also Sims v. Apfel*, 172 F.3d 879 *3 (10th Cir. 1999) (unpublished) (failure to follow doctors' instructions was a factor in determining credibility).

These were legitimate and specific reasons for finding Piro less than fully credible, and these reasons were closely linked to substantial evidence. Much of Piro's attack on the ALJ's credibility assessment consists of blanket statements and one-sentence arguments that are undeveloped and perfunctory and that deprive the Court of the ability to meaningfully analyze

16

them.  Plaintiff's Opening Brief, Dkt. #18, pp. 4-6.  These truncated arguments are waived.  *Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009).

> Although [claimant] lists four issues on appeal, she interjects numerous conclusory sub-issues and passing objections, many of which are poorly developed.  We will consider and discuss only those of her contentions that have been adequately briefed for our review.

*Miller v. Astrue*, 496 Fed. Appx. 853, 855 (10th Cir. 2012) (unpublished).  *See also Keyes-Zachary*, 695 F.3d at 1161 (declining to consider poorly-developed sub-issues).  Further, the Court will not address Piro's objections to boilerplate provisions that were included in the ALJ's analysis, because as discussed above, the Court did not consider those provisions.  Even excluding those provisions, the ALJ's credibility assessment is supported.

Moreover, even absent a finding of waiver, Piro's arguments are simply not persuasive.  Piro mentions the factors that are to be considered by an ALJ, and he says that the ALJ did not perform even a "minimal" discussion of those factors, but he does not elaborate.  Plaintiff's Opening Brief, Dkt. #18, p. 4.  As discussed above, the ALJ gave numerous legitimate reasons for discounting Piro's credibility, and he linked those reasons to substantial evidence.  "[T]he ALJ need not provide a factor-by-factor recitation of the evidence when analyzing the claimant's credibility."  *Harper v. Colvin*, 2013 WL 3285617 *4 (10th Cir.) (unpublished).

Piro next appears to argue that the ALJ was required to explain in more detail how credible he believed Piro's pain was.  *Id.*  He provides no authority for such a requirement.  Moreover, it is sufficiently clear to this reviewer that he found Piro's claims of disabling pain and numbness credible enough that he made an RFC determination that included significant limitations.  He limited Piro to a range of sedentary work, which reflects that he believed Piro's testimony that he was unable to do the standing or walking that would be required in work at

other exertional levels. (R. 18). He limited Piro's use of foot pedals, indicating that he understood that Piro had some limited use of his feet due to his symptoms of diabetic neuropathy. *Id.* He limited Piro's climbing stairs and ramps to only occasional frequency, and he stated that Piro was unable to climb ropes, ladders, and scaffolds or work in dangerous environments. *Id.* All of this shows that the ALJ gave significant consideration to Piro's testimony. *See Williams v. Colvin*, 2013 WL 1701049 *4 (10th Cir.) (unpublished) (ALJ's statements regarding claimant's testimony and her credibility were adequate); *Jimison ex rel. Sims v. Colvin*, 513 Fed. Appx. 789, 795 (10th Cir. 2013) (unpublished) (no basis for remanding on the ground that the ALJ was not specific regarding claimant's testimony).

Piro then states that his claims of pain and numbness were supported by objective evidence. Plaintiff's Opening Brief, Dkt. #18, p. 4. The difficulty with this argument is that this Court's inquiry is not whether *his* claim has evidence that supports it. The Court's inquiry is whether *the ALJ's decision* is supported by substantial evidence. *Adams ex rel. D.J.W. v. Astrue*, 659 F.3d 1297, 1301 (10th Cir. 2011) (affirming ALJ's decisions regarding child's asthma and credibility of testimony because they were supported by substantial evidence).

Piro objects to the ALJ's discussion of his activities of daily living because he did these activities at his own pace and with breaks. He therefore argues that these activities do not support the conclusion that he can perform sedentary work for forty hours a week. Plaintiff's Opening Brief, Dkt. #18, pp. 4-5. While minimal activities of daily living alone do not constitute substantial evidence that a claimant does not suffer disabling pain, an ALJ may consider them as part of his evaluation of the claimant's credibility. *Zaricor-Ritchie v. Astrue*, 452 Fed. Appx. 817, 822-23 (10th Cir. 2011) (unpublished). The ALJ's discussion of Piro's activities of daily

living complied with legal requirements, because he only considered those activities as part of his evaluation.

"In sum, the ALJ closely and affirmatively linked his adverse credibility finding to substantial evidence in the record and did not employ an incorrect legal standard. 'Our precedents do not require more, and our limited scope of review precludes us from reweighing the evidence or substituting our judgment for that of the agency.'" *Zaricor-Ritchie*, 452 Fed. Appx. at 824, *citing Wall*, 561 F.3d at 1070 (further quotations omitted).

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 12th day of November 2013.

_____
Paul J. Cleary
United States Magistrate Judge